UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at WINCHESTER

| | | |
|---|---|---|
| MARY ANN WOMACK, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Case No. 4:10-cv-44 |
| v. | ) | |
| | ) | Judge Mattice |
| BROWN-FORMAN CORPORATION and | ) | |
| STEVEN GOODNER, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Before the Court are Defendant Brown-Forman Corporation's ("BFC") Motion for Leave to File Excess Pages (Doc. 31), Defendants' Motions for Summary Judgment (Docs. 37, 44), and Motions *in Limine* filed by both parties (Docs. 58, 60, 62, 64, 66, 70, 75). BFC's Motion for Leave to File Excess Pages (Doc. 31) is **GRANTED**.

The Court has considered Defendants' Motions for Summary Judgment, as well as Plaintiff's Response (Doc. 55) and Defendants' Reply (Doc. 56), as well as the accompanying evidence. For the reasons discussed herein, the Court will **GRANT IN PART AND DENY IN PART** Defendants' Motions for Summary Judgment. The Court will also **DENY AS PREMATURE** the parties' Motions *in Limine*.

## I.    BACKGROUND

For the purposes of summary judgment, the Court will view the facts in the light most favorable to Plaintiff. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In 1975, at the age of 19, Plaintiff began working for BFC at the Jack Daniel's Distillery ("JDD"). (Doc. 77 at 3-4). Plaintiff was originally hired as a clerk typist, but

over a number of years, she was promoted to various salaried positions at JDD. (*Id.*). Plaintiff's husband, Mike, also worked at JDD for many of years, where he held several positions, his last as the general services manager. (*Id.* at 4-5).

In 1990, Plaintiff was promoted to the position of buyer, where her duties included buying janitorial, lab, maintenance, repair, and operating supplies. (*Id.* at 4). In 1994, Plaintiff was promoted to the position of senior buyer. (*Id.*). Plaintiff's duties as senior buyer included purchasing similar supplies as those that she was responsible for in her prior position, but she was also responsible for buying certain production supplies, including glass and labels. (*Id.*).

At the time Plaintiff was promoted to senior buyer, there was one other senior buyer at JDD, John Hale. (*Id.* at 7). Hale began working at JDD in 1971, four years before Plaintiff began work at JDD. (Doc. 38-2 at 3). Hale was promoted to buyer in 1981, nine years before Plaintiff's promotion to buyer, and he was moved to the position of senior buyer in 1990, approximately four years prior to Plaintiff's promotion to that position. (*Id.* at 3; Doc. 40 at 1; Doc. 77 at 8). Plaintiff's understanding was that her job duties were "basically the same" as Hale's; Plaintiff and Hale both handled capital items and repeat buys, but the two handled different commodities. (Doc. 77 at 7-8). Plaintiff also indicated that Hale handled the requisitions and purchase orders for construction projects. (*Id.* at 8). According to Plaintiff, around the time that she was promoted, she and Hale were each advised of the need to obtain both a college degree and a specialized purchasing certification. (*Id.* at 3). However, the JDD position description for "senior buyer" indicates that candidates "must" have a "Bachelor's Degree combined with 4 – 6 years of experience in purchasing, maintenance, repair, and operating supplies; **or** 10-12 years of related equivalent experience," and that the specialized certification was a

"preferred" qualification. (Doc. 52-2 at 2) (emphasis added). In the mid-1990's, Plaintiff obtained both her college degree and the purchasing certification, but Hale did not obtain either. (Doc. 77-2 at 10).

As a senior buyer, Plaintiff reported directly to the Strategic Sourcing Manager; in 2003, Steve May took over that position, becoming Plaintiff's new supervisor. (Doc. 38-3 at 14; Doc. 77 at 4). According to May, after he was hired, he discovered that Plaintiff "was not performing her duties satisfactorily, and . . . had not been doing so for quite some time." (Doc. 41 at 1). May stated that Plaintiff "appeared to be treating her job as if it was simply a matter of completing an administrative task." (*Id.*). According to May, he received complaints that Plaintiff was "rude and abrasive," non-responsive, and would order items that she wanted to order, rather than the items requisitioned by her customers. (*Id.*). Plaintiff concedes that she was counseled by May during that time regarding a "change in POs or vendors." (Doc. 77-1 at 6).

In June 2003, Plaintiff's "Performance Partnership," JDD's annual performance review model, was submitted. (Doc. 38-2 at 132). While much of Plaintiff's feedback was positive, she was given a rating of "Achieves Most" and was advised that she needed to work on her professional relationships and manner of communications. (*Id.* at 132-48). May commented that,

> Mary Ann is lacking in her ability to properly communicate with her customer base. This was an issue last year and she was provided resources to help her in this area. There has been a small improvement since then but there has been continued feedback indicating that she still needs further improvement in this area. Mary Ann needs to continue to focus on interpersonal skills and overall ability to build strong relationships with her peer groups and customers.

(*Id.* at 136).

As a result of this evaluation, Plaintiff was placed on a Performance Improvement Plan ("PIP"). (Doc. 41 at 2). May spent approximately 25 percent of his time working with Plaintiff to improve her performance. (*Id.*). According to May, Plaintiff's performance did, in fact, improve "[w]ith this constant reinforcement." (*Id.*).

In October 2004, Plaintiff's husband was diagnosed with cancer. (Doc. 77 at 2, 5). Mike continued to work at JDD, but he applied for and was approved for intermittent leave under the Family Medical Leave Act ("FMLA"). (*Id.* at 5). Plaintiff began taking some time off from work to care for her husband. (*Id.* at 5-6). According to Plaintiff, she "usually worked around the hours to make them up;" otherwise, she used vacation time to cover the times that she needed to be out for more than fifteen minutes. (*Id.* at 6-8). Although Plaintiff stated that she and Hale would generally "fill[] in for each other in absences," she stated that Hale did not cover her work for her while she was out unless it was an emergency. (*Id.* at 7; Doc. 77-2 at 11-12). Instead, she would come back and try to "catch up" herself. (Doc. 77-2 at 11-12).

Plaintiff concedes that she was never denied time off to care for her husband or expressly disciplined for doing so, nor did she lose any compensation for taking such time. (Doc. 77 at 9). May, who was Plaintiff's supervisor at the time her husband became ill, was supportive of her need to be away from the office and did not make any negative comments about her absences. (*Id.* at 8-9).

In 2006, Tom Neiheisel took over for May as Strategic Sourcing Manager. (Doc. 38-4 at 2). In 2007, Plaintiff's husband began chemotherapy, and Plaintiff began taking off approximately two to six hours of work every one to two weeks to attend Mike's chemotherapy appointments. (Doc. 77-2 at 11). Plaintiff occasionally encountered situations that necessitated her leaving work in the middle of the day. (Doc. 77 at 6). In

those situations, Plaintiff was sometimes gone for only a matter of minutes, but at other times, she was out of the office for a couple of hours. (*Id.* at 6-7). Plaintiff also recalled that there were some instances where she was required to change appointment times because she was unable to take time off from work. (*Id.* at 10). On some occasions, Neiheisel told Plaintiff that it would be better to change the appointments than to leave her department unattended, but she was never told that she could not take off to go to an appointment with her husband. (Doc. 77-1 at 4). Neiheisel also did not make any express comments about Plaintiff's time away from work and told her to take time off as needed. (Doc. 77 at 9; Doc. 77-2 at 7). Neiheisel did, however, discipline her several times for leaving without telling anyone that she was going to be out of the office. (Doc. 77 at 9).

Sometime around April 2007, Plaintiff made a mistake in completing an alcohol requisition from a particular vendor; the part number on the requisition pulled up two different items, and she later learned that she had ordered the wrong one of the two items. (*Id.* at 2, 6-7). Plaintiff was told that, in doing so, she "had changed the vendor and . . . could have cost the company an entire production by doing that." (*Id.* at 6, 11). Plaintiff maintained that she did not change the vendor. (*Id.* at 6).

In the summer of 2007, Plaintiff opened her annual Performance Partnership document to perform her employee self-evaluation. (*Id.* at 1-2). The form had already been filled in and, although there were some criticisms of Plaintiff's work performance, Neiheisel had given Plaintiff ratings of "Achieves All" and "Fully Achieves" for her performance goals. (*Id.* at 1). However, when Plaintiff reopened the document to finish her self-evaluation later that same day, she noticed that her ratings had changed from "Fully Achieves" to "Achieves Most." (*Id.* at 2). When Plaintiff asked Neiheisel about the

change, he stated that he did not "know what that's about" but indicated that he would find out. (*Id.*). Soon after, Neiheisel advised Plaintiff that Steve Goodner, the Assistant Vice-President / Director of Supply Chain Operations, had made the change based on the April 2007 alcohol requisition incident. (*Id.*; Doc. 38-3 at 15-16, 18). Plaintiff later took Neiheisel some paperwork regarding the incident and asked him about talking to Goodner. (Doc. 77-1 at 2.). Neiheisel advised her not to talk to Goodner, so Plaintiff instead asked him to pass the paperwork along to Goodner on her behalf. (*Id.*)

On her 2007 Performance Partnership, Plaintiff received an overall rating of "Achieves Most." (Doc. 38-4 at 37). Neiheisel indicated that Plaintiff had not made an effort to make personal visits with her internal customers and that Plaintiff's internal customers and suppliers had submitted complaints regarding her lack of responsiveness. (*Id.* at 36). Neiheisel also made note of the April 2007 incident, stating that Plaintiff had made changes to a requisition that "could have resulted in thousands of dollars in lost product." (*Id.* at 36-37). Neiheisel also commented that Plaintiff's "[d]isposition and attitude varied frequently through the year," and further stated,

> Mary Ann has had a difficult year personally. It has been a delicate balance to keep open lines of communication and provide honest and timely performance feedback while being conscious of the pressures of her personal life. We will continue to work together to the extent possible to overcome these performance issues.

(*Id.* at 37, 39).

According to Plaintiff, she would promptly respond to e-mails whenever she was at the office, but she did not always receive notices that she had new e-mails. (Doc. 77-1 at 11). Plaintiff confirmed that her voicemail did fill up at times, but confirmed that those instances were the result of her absences to care for her husband. (Doc. 77-2 at 12). Plaintiff conceded that there were times that she did not return voicemails because

people would often end up calling Neiheisel for a resolution during her absence. (Doc. 77-1 at 11). After a discussion with Neihesiel, Plaintiff agreed to follow up with all callers to ensure that their issue had been resolved. (*Id.*).

On July 31, 2007, as a result of her Performance Partnership rating of "Achieves Most," Plaintiff was placed on a PIP for the second time in her more than 30 years of work at JDD. (Doc. 52-3 at 1). The PIP indicated that "immediate and sustained" improvement was required in multiple areas and specified that Plaintiff was to meet with Neiheisel on a monthly basis to review her progress. (*Id.*).

Plaintiff was given specific actions to take to improve in the following categories: (1) "internal customer follow-up and responsiveness"; (2) "relationship building"; and (3) "knowledge sharing." (*Id.* at 1-2). Plaintiff was advised to follow up on all purchase orders via email or fax. (*Id.* at 1; Doc. 77-1 at 12). Plaintiff indicated that she was not previously aware that there was an issue with her prior practice of following up only when the item was "critical or a rush." (Doc. 77-1 at 12). Plaintiff was advised that she must handle all communications in a "prompt, professional and courteous manner;" however, Neiheisel did not provide her with any examples of when her communications had fallen short of this standard, and Plaintiff felt that she had communicated in such a manner in the past. (*Id.* at 13; Doc. 52-3 at 2). She was also informed that she was not permitted to allow her voicemail inbox to remain full, and she was instructed that she must advise her internal customers via email when she would be out of the office and give those customers notice of an alternate contact person for the duration of any absence. (Doc. 52-3 at 1; Doc. 77-1 at 12). Plaintiff was prohibited from making any changes to requisitions without the written approval of the requisitioner and was advised that oral communications were to be "followed up with written confirmation for

7

critical or complex requests." (Doc. 52-3 at 1; Doc. 77-1 at 13). Plaintiff was instructed to increase her communications with her internal customers, including one-on-one meetings with those customers on a quarterly basis. (Doc. 52-3 at 2; Doc. 77-1 at 12-13).

On August 2, 2007, Neiheisel prepared a memorandum that was sent to Goodner and Steve Jones, JDD's Human Resources Manager, regarding an August 1, 2007 meeting that Neiheisel and Goodner held with Plaintiff regarding the implementation of her PIP. (Doc. 40 at 1; Doc. 77-1 at 14). Neiheisel indicated that he had discussed with Plaintiff the specific areas of improvement needed, along with anticipated completion date for each area of concern. (Doc. 45-1 at 21). Plaintiff's "unacceptable, repeating pattern of inconsistent performance" was discussed, and Goodner advised Plaintiff that such performance-related discussions "would not be a recurring event." (*Id.* at 22). Plaintiff was advised that the PIP "was the last chance at improving . . . . The next discussion would be termination." (*Id.*; Doc. 77-1 at 14). Plaintiff was also told that her "[a]ttitude must improve and maintain on a friendly and professional level." (Doc. 45-1 at 22). Plaintiff was instructed that, as a condition of her continued employment, she would be required to partake in a mandatory employee assistance program ("EAP"), wherein she would speak with a doctor regarding the difficulties and stresses related to her husband's illness. (*Id.*; Doc. 77-1 at 15). According to Plaintiff, Neiheisel did not give her any reasoning for why he wanted certain actions in the PIP done, but she did not ask for any clarification. (Doc. 77-1 at 13).

According to Plaintiff, she began working to implement the actions specified in the PIP. She began faxing her customers copies of requisitions and emails when items were completed and began following up on all orders. (*Id.* at 12-13). Plaintiff confirmed that, although she did start sending emails to her internal customers when she knew

that she would be out of the office, she did not send such e-mails when she received an emergency phone call. (*Id.* at 12).

During the course of 2007, Plaintiff began to feel that her absences were being "used against" her. (Doc. 77 at 14-15). In part, this belief was based on the fact that, until 2007, Plaintiff had received favorable performance evaluations for every year that she had worked at BFC except for 2003. (*See* Doc. 52-1 at 37-38). Plaintiff felt that "things escalated" when she started taking more time off and that her supervisors began to look for things to use against her. (Doc. 77 at 15). Plaintiff specifically felt that Neiheisel was using her absences against her, as he had previously told her not to worry about taking time off and to do whatever she needed to do, and "then all of a sudden . . . turned" and made an issue of her leaving without telling anyone. (*Id.* at 14-15). She also believed that someone was advising Neiheisel to find things to use against her, as evidenced by the change in the tone of his communications in mid-June, as well as a statement in an email that "this is all I can find." (*Id.* at 15). Neiheisel later told Plaintiff that Goodner was "looking for an excuse" to document her shortcomings. (Doc. 77-1 at 3; Doc. 38-4 at 4-5). Neiheisel stated that these comments were his "personal opinion" and that he never heard Goodner make comments about looking for an excuse to discipline Plaintiff. (Doc. 42 at 1).

Plaintiff also began to feel that she was treated differently in respect to the terms and conditions of her employment because she "didn't fit into the 'good ole boy' network." (Doc. 77 at 19). Plaintiff told Jones that she was "measured with a different yardstick than [Hale] and the others." (*Id.* at 15, 18). Plaintiff noted that she was asked to do a lot more reporting and administrative work than Hale was asked to perform, and

that Hale was not required to go out on visits. (*Id.* at 15-16). Hale was also asked to attend company dinners that Plaintiff was not invited to attend. (*Id.* at 16).

Plaintiff stated that she had received occasional phone calls or comments indicating that Hale was difficult to get in touch with, did not return voicemails, and changed product orders or failed to purchase the product that someone wanted. (*Id.* at 16-17). She indicated that, when people would look for Hale, sometimes his truck was still in the parking lot, and she would assume that he was on a smoke break. (*Id.* at 15). Other times, Hale's truck was gone, and she did not know where he had gone. (*Id.* at 15, 18). Plaintiff indicated that it was "a pretty common occurrence" for people to be looking for each other on the floor, and, to her knowledge, Hale was never disciplined for leaving the floor without letting anyone know where he was going. (*Id.* at 15). She confirmed that Hale would send out a memo or email when he was going to be out of the office for a day or longer. (Doc. 77-2 at 13). According to Neiheisel, he did not receive any complaints about Hale's job performance, and he believed that Hale had strong interpersonal work relationships. (Doc. 42 at 1).

Beginning in August 2007, Plaintiff began keeping phone and email logs to document her work communications. (Doc. 77 at 11-12). Plaintiff would periodically provide Neiheisel with copies of those documents for the purposes of performance assessment. (*Id.* at 12). Plaintiff also purchased a compact recording device to record certain conversations that she had while at work, specifically, conversations with Jones and Neiheisel related to her job performance or other work feedback. (*Id.* at 11-12). Plaintiff would occasionally text her husband about things that were happening at work that she felt were inappropriate. (*Id.* at 12).

According to Neiheisel, Plaintiff demonstrated "a genuine and noticeable improvement in performance" for most of the 2007 to 2008 fiscal year. (Doc. 38-4 at 41). However, on October 10, 2008, Neiheisel prepared a memorandum for Jones and Goodner indicating that Plaintiff's performance had "begun to slip." (*Id.*). Neisheisel stated that Plaintiff's efforts at relationship building had "stopped altogether," she had not made any effort to assist in training the new administrative assistant, and she spent a "disproportionate amount of work hours on the Internet accessing non-job related sites . . . account[ing] for a minimum of 25% of her daily activity." (*Id.*).[1]

On November 7, 2008, Neiheisel prepared a Corrective Action Notice for Plaintiff. (Doc. 45-1 at 23). The notice, which was labeled "Final Written Warning," stated that Plaintiff had "been counseled and coached to improve and maintain her work performance, including communication skills, interpersonal skills, personal use of company internet, and other elements of her position." (*Id.*). The notice indicated that no additional counseling sessions would be conducted and that Plaintiff's "[f]ailure to improve and maintain a high level of work performance will result in termination." (*Id.*). Goodner and Neiheisel met with Plaintiff that same day to give her the notice and advised Plaintiff that she would have been terminated already had it not been for her husband's illness. (Doc. 77-1 at 19).

On December 5, 2008, Neiheisel prepared a memorandum for Jones and Goodner regarding another performance issue with Plaintiff's work. (Doc. 38-1 at 77).

---

[1] Neiheisel attached a "summary of verbal discussions," indicating that he had met with Plaintiff on three specific dates from July through October of 2008 to discuss these topics. (Doc. 38-4 at 42). Plaintiff maintains that these discussions never took place, and that she was actually not at work on the dates that Neiheisel stated that he had these discussions with her. (Doc. 77-1 at 16; Doc. 38-1 at 44). Plaintiff contends that she and Neiheisel had one brief and general conversation about how "the shipping girls" were being watched for being on the internet. (Doc. 38-1 at 44). Defendant has conceded that Plaintiff's version of events must be accepted as true for the purposes of summary judgment. (*See* Doc. 38 at 7 n.7).

Specifically, Plaintiff failed to notify the production team of a shipment delay which could have cost the company several hours of production time. (*Id.*). Neiheisel indicated that he had advised Plaintiff that future lapses of this nature would "clearly lead to termination." (*Id.*).

Starting in 2008, Plaintiff had also begun caring for her sick aunt "off and on." (Doc. 77 at 5). Plaintiff's mother, Sarah, was diagnosed with cancer in February 2009, which led to additional time that Plaintiff needed to be absent from work. (*Id.*). According to Goodner, he was "bombarded" with "general" negative feedback about Plaintiff around this time. (Doc. 38-3 at 3-7). Goodner indicated that all of this feedback was verbal, and there was accordingly no record of the negative comments about Plaintiff. (*Id.*).

On June 15, 2009, Plaintiff asked Neiheisel, as she did every month, if he had any performance issues to discuss with her. (Doc. 77-2 at 2-3; Doc. 38-1 at 76). Several minutes later, Neiheisel provided her with a list of performance issues, including that she had been seen with newspapers and crossword puzzles in the morning hours, that her purchase order accuracy had suffered in the most recent months, and that she had left work without notifying anyone of her whereabouts. (Doc. 77-2 at 3; Doc. 38-1 at 76). Plaintiff explained to Neiheisel that there had been no one on the floor to tell about her need to leave on the occasions that she did not inform anyone that she was leaving for an emergency. (Doc. 77-2 at 3). According to Plaintiff, there were only three times that she had emergencies that required her to leave the office without letting anyone know that she would be out. (Doc. 77-1 at 12). She also indicated that crossword puzzles and the newspaper were her "version of a coffee break." (Doc. 77-2 at 3).

On her performance evaluation for the fiscal year ending April 30, 2009,[2] Plaintiff was rated at a level of "Immediate Improvement Required." (Doc. 38-1 at 100, 103). Specifically, Neiheisel noted that Plaintiff's performance had declined in the following areas: excessive time spent on non-work activities, such as internet, crosswords, and newspapers; accuracy of paperwork; notification of supervisors or colleagues before leaving work; following up with supply chain staff regarding the late delivery of materials; consistent and prompt responses to internal customers; and consistent relationship building. (*Id.* at 103-04).

Plaintiff conceded that she sometimes used the internet for personal use, but she denied that such use was "excessive." (Doc. 77-1 at 8, 19, 21). Plaintiff stated that Hale, along with many other employees, "used the internet," and, as far as she knew, she was the only employees to ever be written up for this conduct. (Doc. 38-1 at 29; Doc. 77 at 15, 18). Neiheisel stated that he never personally saw Hale reading a newspaper at the office or spending excessive time on the internet for non-work related purposes. (Doc. 42 at 1). It is undisputed that general personal use of the internet was not prohibited for JDD employees. (See Doc. 38-2 at 25; 38-4 at 19; Doc. 52-1 at 24).

According to Plaintiff, she had frequently told her managers that "their issues and complaints were not accurate." (Doc. 77-2 at 15). When Plaintiff asked for specific examples of her alleged deficiencies, she was "told that doesn't matter." (*Id.* at 14). Plaintiff believed that the disciplinary and performance issues that were brought up from 2007 and beyond were all either examples of BFC improperly using her time off to

---

[2] The 2009 performance review includes an "Appraisal Date" of July 7, 2009. (Doc. 38-1 at 100). Plaintiff was "not sure" what that date meant, but indicated that it may have been the date that she had a discussion with management about her performance review. (Doc. 77-2 at 13).

care for her husband and mother against her or were "out and out lies and falsification of documents." (*Id.* at 14-15; Doc. 38-1 at 57, 61, 63; Doc. 77-1 at 4).

Until the summer of 2009, Plaintiff was using her vacation time to care for her husband and her mother and believed that "you only took FMLA leave if you were on sick leave[.]" (Doc. 77 at 5-6). Neither Goodner nor any member of the human resources department advised Plaintiff that she "probably should have asked for FMLA leave." (*Id.* at 9, 17). Finally, in June 2009, Mike advised Plaintiff that she could file for FMLA leave. (*Id.* at 6). Plaintiff began the process of applying for FMLA leave, and submitted the accompanying medical certification form to her husband's doctor for completion in early to mid-July. (Doc. 77-2 at 6). On July 20, 2009, Plaintiff signed and submitted her application for FMLA leave. (Doc. 38-1 at 78-80).[3]

Also on July 20, 2009, Plaintiff attended a meeting with Jones and Goodner. (Doc. 77 at 14). At that meeting, Plaintiff was advised that, as of September 1, 2009, she would be relieved of her duties as a senior buyer and would be demoted to the position of assistant shipping administrator. (*Id.* at 4, 13). Plaintiff's duties in her new position would include preloading export orders and ensuring that were no problems on the shipping floor. (Doc. 77-1 at 7-8). According to Goodner, the decision was made by himself, Jones, Neiheisel, and a number of other individuals who had to approve of the decision. (Doc. 38-3 at 11). At this meeting, Goodner advised Plaintiff that her new position would give her less responsibility within the company and would let her take a lesser role given all of the "pressures" that she was under. (*Id.* at 12-13). Goodner told Plaintiff that everyone understood why she had been out and that the decision was not

---

[3] The record reflects that, although Plaintiff submitted her request for FMLA leave to BFC on July 20, 2009, the medical certification was not signed and dated by her husband's health care provider until July 22, 2009. (Doc. 38-1 at 83).

based on her absences, and was instead based only on her job performance. (*Id.* at 13). Goodner stated that, because she would have less responsibility in her new position, the times that she needed to be out would be "less impactful" on the department as a whole. (Doc. 52-5 at 17).

Plaintiff filed an internal complaint with the corporate office on August 5, 2009. (Doc. 77-1 at 8-9; Doc. 43). As part of the internal investigation of Plaintiff's complaint, Kathy Stearman from the corporate office came to get Plaintiff's story. (Doc. 77 at 13). Stearman also met with a number of other employees, including Jones, Goodner, Neiheisel, and May. (Doc. 43). Stearman "concluded that Plaintiff was not meeting the expectations of her position and had not been doing so for a significant period of time," and determined that the decision to demote Plaintiff "was based solely on . . . performance issues." (*Id.*).

Plaintiff's request for intermittent FMLA leave to care for her husband was approved on July 25, 2009. (Doc. 38-1 at 78). Plaintiff filed a second request for intermittent FMLA leave, based on care for her mother, on August 10, 2009, which was also approved. (*Id.* at 84). Plaintiff continued to use FMLA leave to care for her husband and her mother. (*See id.* at 78-99). Plaintiff's mother died in August 2009. (Doc. 77 at 5).

On September 1, 2009, Plaintiff assumed her new position, and her salary was reduced by approximately $30,000.00 as a result of the demotion. (Doc. 77-1 at 8; Doc. 77-2 at 5). At that time, Plaintiff was replaced as senior buyer by another female employee. (Doc. 77-1 at 3). Plaintiff's husband died in June 2010. (Doc. 77-2 at 6).

Plaintiff initiated this action on June 23, 2010. (Doc. 1). In her amended civil complaint, Plaintiff alleged that Defendants' had subjected her to various unlawful

employment practices. (Doc. 15 at 1-8). Specifically, Plaintiff alleged that Defendants were liable for both interference and retaliation under the FMLA, sex discrimination under the Tennessee Human Rights Act ("THRA"), and that BFC was additionally liable for Title VII sex discrimination.[4] (Doc. 5 at 8-11). Defendants now seek summary judgment. (*See* 37, 44).

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 instructs the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting the presence or absence of genuine issues of material facts must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587; *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the

---

[4] Plaintiff's Complaint also raised claims of age discrimination under the THRA and the Age Discrimination in Employment Act ("ADEA"), as well as a claim that Defendants violated the Employee Retirement Income Security Act ("ERISA"). (Doc. 15 at 2, 9-11). However, Plaintiff expressly abandoned her ERISA and age discrimination claims in her response to Defendants' Motions for Summary Judgment. (Doc. 55 at 1 n.1). Accordingly, Defendants are entitled to summary judgment as these claims. *See* E.D. Tenn. L.R. 7.2; *see also Parker v. Zale Corp.*, --- F. Supp. 2d ---, 2012 WL 1071194, *9 (E.D. Tenn. 2012) (finding that defendants are entitled to summary judgment as to claims that plaintiff abandons at the summary judgment stage).

16

truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586; Fed. R. Civ. P. 56). The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial. *Anderson*, 477 U.S. at 248-49 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475-76 (6th Cir. 2010). A mere scintilla of evidence is not enough; rather, there must be evidence from which a jury could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252; *Moldowan*, 578 F.3d at 374. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

## III.    ANALYSIS

### A.    FMLA Claims

Under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.*, eligible employees are entitled to a total of 12 workweeks of leave during any 12-month period for certain events, including "to care for the spouse, or a son, daughter, or parent of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). The FMLA makes it unlawful for any employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act]," 29 U.S.C. § 2615(a)(1), or to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]." 29 U.S.C. § 2615(a)(2).  Employers who violate the FMLA are liable to the employee for damages and such equitable relief as may be appropriate.  29 U.S.C. § 2617(a)(1).

There are two distinct theories of recovery under the FMLA: the "interference" or "entitlement" theory, grounded in § 2615(a)(1), and the "retaliation" or "discrimination" theory, grounded in § 2615(a)(2).  *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012).  Plaintiff has raised claims under both theories, and they will be discussed in turn.

### 1.    FMLA Interference

In order to prove a claim for FMLA interference, a plaintiff must establish that: "(1) [s]he was an eligible employee, (2) defendant was a covered employer, (3) [s]he was entitled to leave under the FMLA, (4) [s]he gave defendant notice of [her] intent to take leave, and (5) the defendant denied [her] FMLA benefits or interfered with FMLA rights to which [s]he was entitled." *Harris v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 594 F.3d 476, 482 (6th Cir. 2010).  "If an employer interferes with the FMLA-

created right to medical leave or to reinstatement following the leave, a violation has occurred, regardless of the intent of the employer." *Seeger*, 681 F.3d at 282 (quotation and citation omitted). The FMLA is not, however, a strict liability statute, as a plaintiff must establish that she was harmed by the defendant's alleged FMLA violation in order to survive summary judgment. *Romans v. Mich Dep't of Human Serv.*, 668 F.3d 826, 842 (6th Cir. 2012).

Plaintiff raises two arguments to support her claim of FMLA interference: (1) Defendants interfered with her FMLA rights "by removing her from the Senior Buyer position . . . rather than permit her continued FMLA leave," and (2) Defendants' failure to give her express notice of her FMLA eligibility, as required by the Code of Federal Regulations, was, in and of itself, a "clear" act of interference. (*See* Doc. 15 at 8; Doc. 55 at 10-13).

Plaintiff's first argument is wholly lacking in merit. The undisputed evidence in the record clearly demonstrates that Plaintiff continued to take qualifying FMLA leave after her demotion. (*See* Doc. 38-1 at 78-99). Thus, Plaintiff has not demonstrated that her demotion interfered with her rights to FMLA leave.

In her second argument, Plaintiff argues that, under 29 C.F.R. §§ 825.300, 825.301, Defendants were required to give her written or oral notice of her eligibility for FMLA leave within five days, along with a written notice detailing the expectations and consequences associated with FMLA leave. (*See* Doc. 15 at 8; Doc. 55 at 11). There is no dispute that Defendants failed to provide Plaintiff with such notice. However, "[a]n employer's failure to comply with the notice requirements of the FMLA only supports a cause of action where the inadequate notice effectively interfere[s] with the plaintiff's

statutory rights." *See Fink v. Ohio Health Corp.*, 139 F. App'x 667, 671 (6th Cir. 2005) (internal quotation and citation omitted).

Here, Plaintiff has not established sufficient facts to survive summary judgment, as she has failed to demonstrate that she suffered any harm or actual interference as a result of Defendants' failure to give her the required notice. Plaintiff alleges that, as a result of BFC's failure to notify her of her FMLA rights, "she used vacation time to care for her husband and mother and worked to move appointments for care and treatment to times when she would not miss work." (Doc. 55 at 12). However, BFC's FMLA policy, as set forth in its employee handbook, requires employees to exhaust "[a]ll vacation and disability benefits . . . as part of the FMLA leave." (Doc. 38-2 at 50). The United States Court of Appeals for the Sixth Circuit has expressly held that the FMLA does not prohibit companies from enacting and enforcing policies that require employees to use their paid benefits in tandem with FMLA leave. *See Allen v. Butler Cnty. Comm'rs*, 331 F. App'x 389, 393 (6th Cir. 2009) (citing 29 C.F.R. § 825.207(a)). Additionally, section 825.302 of the Code of Federal Regulations provides in relevant part that an employee must consult with the employer when scheduling medical treatments, to "attempt to work out a schedule which meets the employee's needs without unduly disrupting the employer's operations." 29 C.F.R. § 825.302(e)-(f).

Clearly, even if Plaintiff had received appropriate notice of her FMLA eligibility, her FMLA rights would not have been unfettered; that is, Plaintiff would still have been required to comply with BFC's policy requiring her to exhaust her vacation time as part of her FMLA leave and to consult with her supervisors to schedule appointments at times that did not unduly disrupt her work schedule. Thus, Plaintiff cannot demonstrate that her use of vacation time or rescheduling of medical appointments

were "harms" that she suffered as a result of Defendants' failure to give her the required notice of eligibility.

Ultimately, Plaintiff does not dispute Defendants' main contention, namely, that from 2004 through 2009, Plaintiff was never denied any time off to care for her husband or her mother. Although Plaintiff may have been denied proper or timely notice of her eligibility, BFC's failure in this regard had no practical effect on Plaintiff's exercise of her statutorily-entitled FMLA rights. Because Plaintiff has not shown that she suffered any harm as a result of this alleged FMLA violation, she is not entitled to relief. Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's FMLA claim under the interference theory is GRANTED.

### 2. FMLA Retaliation

In order to prove a claim for FMLA retaliation, a plaintiff must establish by a preponderance of the evidence that: "(1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action." *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006) (citing *Arban v. West Publ'g Co.*, 345 F.3d 390, 404 (6th Cir. 2003)). An FMLA retaliation claim accordingly centers around "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason," and "[t]he employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically because those employees invoked their FMLA rights." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (citation and internal quotation marks omitted).

21

"The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Seeger*, 681 F.3d at 283 (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir.2007)); *see also EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (noting that plaintiff's burden of establishing a *prima facie* case is not an onerous one). The Sixth Circuit has held that "acutely" close temporal proximity between the protected activity and the adverse employment action "is deemed indirect evidence such as to permit an inference of retaliation[.]" *Id.* at 283-84 (quoting *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004)).

The *McDonnell Douglas* burden shifting framework apples to FMLA retaliation claims. *Romans*, 668 F.3d at 842; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1972). Thus, after the plaintiff establishes a *prima facie* case of FMLA retaliation, the burden shifts to the defendant to establish a legitimate, non-discriminatory reason for its action. *Id.* If the defendant sets forth a legitimate, non-discriminatory reason for the adverse employment action, the burden then shifts back to the plaintiff to establish pretext by showing that the employer's proffered reasons (1) have no basis in fact, (2) did not actually motivate the action, or (3) were insufficient to warrant the action. *Seeger*, 681 F.3d at 285 (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). The plaintiff "bears the burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant [ ] intentionally discriminated against h[er]." *Id.* (quoting *Clark v. Walgreen Co.*, 424 F. App'x 467, 474 (6th Cir. 2011)). Despite the fact that temporal proximity may be sufficiently close to establish a causal connection in the

*prima facie* case, "temporal proximity cannot be the sole basis for finding pretext." *Seeger*, 681 F.3d at 285 (quoting *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012)). "Suspicious timing," however, may be "a strong indicator of pretext when accompanied by some other, independent evidence." *Id.* (quoting *Bell v. Prefix, Inc.*, 321 F. App'x 423, 431 (6th Cir. 2009)).

In this case, there is no dispute as to the first three prongs of the *prima facie* case; Defendants concede that Plaintiff's leave from 2004 through 2009 qualified as FMLA leave and acknowledge that her demotion was an adverse employment action. Defendants dispute only the fourth prong, namely, that there was a causal connection between Plaintiff's FMLA leave and her demotion. Specifically, Defendants argue that it "defies credulity" to conclude that there was a causal connection between Plaintiff's FMLA leave and her demotion because BFC would have "demoted her immediately after she began taking leave" if it possessed discriminatory animus.

The Court disagrees and finds that Plaintiff has met her minimal burden of proof to establish a *prima facie* case of FMLA retaliation. The evidence demonstrates that, while Plaintiff was taking some FMLA leave as early as 2004, the amount of time that she was out of the office increased substantially in 2007 when her husband began chemotherapy, and increased again in 2009 when her mother was also diagnosed with cancer. The evidence also demonstrates that the number of disciplinary actions taken against Plaintiff significantly increased during this time period, and that Plaintiff's supervisors referenced her personal problems in her disciplinary actions and at her demotion meeting. Moreover, Plaintiff's demotion occurred on the same day that Plaintiff filed her first formal request for FMLA leave. The Court finds that Plaintiff has shown, by a preponderance of the evidence, a causal connection between her FMLA

leave and her demotion, and has thus met her burden of proof to establish a *prima facie* case of FMLA retaliation.

The burden accordingly shifts to Defendants to show a legitimate nondiscriminatory reason for Plaintiff's demotion. Defendants have met this burden by pointing to Plaintiff's annual reviews and disciplinary notices during the relevant time period, and asserting that Plaintiff's termination was based solely on her poor work performance.

The burden now shifts back to Plaintiff to establish pretext by showing that BFC's proffered reasons (1) have no basis in fact, (2) did not actually motivate the action, or (3) were insufficient to warrant the action. Viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has presented sufficient evidence to give rise to an inference of retaliation. First, the timing of Plaintiff's demotion – on the same day that she submitted her first formal request for intermittent FMLA leave – is highly suspicious; this close temporal proximity between Plaintiff's request for FMLA leave and her demotion is evidence of pretext.

Temporal proximity, however, is not the only suspicious evidence in the record. Neiheisel made explicit references to Plaintiff's absences and personal struggle in dealing with the illnesses of her husband and her mother in disciplinary memoranda and reports. (Doc. 38-4 at 37, 39; Doc. 45-1 at 22; Doc. 77-1 at 15). Additionally, Neiheisel made comments about Goodner looking for an "excuse" to punish Plaintiff, and confirmed as much in an email stating that "this is all I could find." (Doc. 38-4 at 4-5; Doc. 42 at 1; Doc. 77 at 15; Doc. 77-1 at 3). Goodner's undisputed statements to Plaintiff during the demotion meeting are additional evidence of pretext, as he made overt references to her absences and clearly stated that her absences would be less

impactful given her lesser responsibilities in her new position. (Doc. 38-3 at 12-13; Doc. 52-5 at 17). These statements, in conjunction with Plaintiff's testimony that the complaints against her were not brought against any other employees exhibiting similar behaviors and ranged from inaccurate to "out and out lies," represent sufficient evidence from which a jury could infer that BFC discriminated against Plaintiff. The Court cannot conclude as a matter of law that Plaintiff's demotion was not motivated by retaliation for her exercise of her FMLA rights. Defendants' Motion for Summary Judgment on Plaintiff's FMLA claim under the retaliation theory is DENIED.

### B. Sex Discrimination Claims

Under Title VII, employers are prohibited from discriminating against an employee based on a number of characteristics, including gender. 42 U.S.C. § 2000e-2(a)(1). The Tennessee Human Rights Act ("THRA") is Tennessee's state-law supplement to Title VII, which serves to "safeguard all individuals within the state from discrimination because of race, creed, color, religion, sex, age, or national origin in connection with employment[.]" Tenn. Code Ann. § 4-21-101(a)(3). Discrimination claims raised under the THRA are evaluated in the same manner as Title VII claims. *See, e.g.*, *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 557 (6th Cir. 2009); *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 714 (6th Cir. 2006).

An employee may establish his discrimination claim using either direct or circumstantial evidence. *Id.* With respect to Plaintiff's gender discrimination claims in the instant case, there is no direct evidence of discriminatory intent. Accordingly, Plaintiff's claims must be analyzed under the *McDonnell Douglas / Burdine* burden-shifting analysis. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-56 (1981); *McDonnell Douglas*, 411 U.S. at 802-04. Under this analytical scheme, the

25

burden first falls to the plaintiff to establish a *prima facie* case of discrimination. *Burdine*, 450 U.S. at 252-53; *DiCarlo*, 358 F.3d at 414. To make a prima facie case of gender discrimination, a plaintiff "must show that: (1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position, in that she was meeting legitimate expectations and performing to her employer's satisfaction; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably." *Grace v. USCAR*, 521 F.3d 655, 677 (6th Cir. 2008); *Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 729 (6th Cir. 1999).

To be considered "similarly situated, "the plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment[.]" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Instead "the plaintiff and the employee with whom the plaintiff seeks to compare . . . herself must be similar in all of the relevant aspects." *Knox v. Neaton Auto Prods. Mfg., Inc.*, 375 F.3d 451, 458 (6th Cir. 2004) (internal quotation marks omitted). "[T]o establish a *prima facie* case, [plaintiff] must identify at least one similar, non-protected employee guilty of conduct of comparable seriousness to the conduct for which [the adverse action was taken] but whom management treated more leniently." *Trout v. First Energy Generation Corp.*, 339 F. App'x 560, 564 (6th Cir. 2009). In order to assess whether the employees' acts were comparably serious, "a court may consider whether the individuals have dealt with the same supervisor, have been subject to the same standards[,] and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Colvin v. Veterans*

*Admin. Med. Ctr.*, 390 F. App'x 454, 458 (6th Cir. 2010) (internal quotation and citation omitted).

If the plaintiff is able to meet her burden of showing a *prima facie* case of discrimination, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination. *Burdine*, 450 U.S. at 253; *DiCarlo*, 358 F.3d at 414. If the defendant is able to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination, the burden then shifts back to the plaintiff to produce evidence from which a jury could find that the defendant's stated reason is actually a pretext for discrimination. *Burdine*, 450 U.S. at 253; *DiCarlo*, 358 F.3d at 414-15.

There is no dispute that Plaintiff meets the first two elements of a *prima facie* case: she is a member of a protected group, namely, female employees, and she was demoted. There is a significant dispute in this case as to whether Plaintiff was "qualified" for her job under the Title VII analysis. However, even giving Plaintiff the benefit of the doubt as to the third element, she is still unable to demonstrate a *prima facie* case of gender discrimination based on the fourth element – that she was replaced by a person outside the protected class or that similarly situated non-protected employees were treated more favorably.

Plaintiff concedes that, when she was demoted from her position as a senior buyer, she was replaced by another female employee. (Doc. 77-1 at 3). Thus, to prove her *prima facie* case, Plaintiff must have presented evidence sufficient for a reasonable jury to find that she was treated differently than similarly situated male employees. Despite her claim to the contrary, Plaintiff has failed to carry this burden.

Plaintiff identifies only one comparable employee in her deposition, John Hale. Although Hale was, like Plaintiff, a senior buyer at the JDD, Hale enjoyed more seniority at the company, given that he had been employed by BFC for four years before Plaintiff was hired, was made a buyer nine years before Plaintiff, and was made a senior buyer four years before Plaintiff. (Doc. 38-2 at 3; Doc. 40 at 1; Doc. 77 at 8). Plaintiff concedes that, although she and Hale shared similar job responsibilities, Hale performed tasks that Plaintiff was not asked to perform, such as requisitions and purchase orders for construction projects. Thus, it does not appear that Plaintiff and Hale were similar in all relevant aspects to be "similarly situated" for purposes of the discrimination analysis.[5]

Even if the Court assumes for the sake of argument that Plaintiff and Hale are similarly situated, Plaintiff has failed to demonstrate that Hale was treated more favorably for comparably serious behavior. Plaintiff has failed to set forth sufficient facts to suggest that Hale was accused of, or committed acts similar to the instances of misconduct that she allegedly committed. Specifically, Plaintiff has not presented any evidence that Hale's customers made any complaints about him, that his supervisors complained about the accuracy and expediency of his work, or that Hale was accused of

---

[5] Plaintiff makes much of the fact that she was paid less money than Hale despite the fact that Plaintiff had both a college degree and a specialized certification -- qualifications which Hale did not possess. However, Plaintiff has failed to present any evidence suggesting that gender discrimination was the reason behind Hale's higher salary. Although Hale did not possess a bachelor's degree, he possessed the requisite experience for the position as detailed in senior buyer position description. Further, the specialized certification that Plaintiff earned was a "preferred," not "required," position qualification. Ultimately, Hale was more senior to Plaintiff at the company, was more senior to Plaintiff as both a buyer and a senior buyer, and enjoyed more responsibilities than Plaintiff, including handling requisitions and purchasing for large construction projects. Plaintiff and Hale were not similarly situated employees, and Plaintiff has not demonstrated that Hale was treated more favorably than her because he was paid more.

using the internet for personal reasons.[6]  Additionally, although Plaintiff generally states that there were times where Hale would leave the office and people would ask where he was, she presents no evidence to show that Hale had not followed procedures for letting his superiors and/or customers know of his absences or that his customers complained about his lack of availability or responsiveness.  Plaintiff also made the statement that Hale "used the internet," but failed to provide any specific details about the frequency or reasons for such use.  Moreover, personal use of the internet was not prohibited for BFC employees, and Plaintiff contended that many BFC employees used the internet and that no employee other than herself was ever written up.

Here, Plaintiff has not presented sufficient evidence that Hale committed serious or comparable misconduct; instead, she merely alleges that, to the extent that he may have committed misconduct, she was not aware of any resulting punishments or consequences. At its core, Plaintiff's argument is that the disciplinary actions and accusations against her were unfounded.  Such arguments and the corresponding evidence may be evidence of pretext for her termination, but they do not ultimately demonstrate that Hale was treated more favorably than Plaintiff for similar misconduct. Plaintiff's evidence is insufficient to establish that Hale was a similarly situated employee who was treated more favorably than her in light of similar conduct. Accordingly, Plaintiff has failed to set forth a *prima facie* claim of gender discrimination, and Defendants are therefore entitled to summary judgment with respect to Plaintiff's claims under Title VII and the THRA.

---

[6] In her deposition, Plaintiff stated that she had heard some things about Hale being difficult to find because of his smoke breaks and "some . . . stuff" that she "d[id]n't want to get into."  (Doc. 77 at 16-17). These types of vague and conclusory statements do not constitute sufficient evidence to create a genuine issue of material fact as to whether Hale was treated more favorably than Plaintiff for similar misconduct. *See Anderson*, 477 U.S. at 248-52.

For the foregoing reasons, Defendants' Motions for Summary Judgment will be **GRANTED** as to Plaintiff's claims of FMLA interference, Title VII sex discrimination, and THRA sex discrimination. However, Defendants' Motions for Summary Judgment will be **DENIED** as to Plaintiff's FMLA retaliation claims. The Court hereby **GRANTS IN PART AND DENIES IN PART** Defendants' Motions for Summary Judgment (Docs. 37, 44).

In light of the Court's order, it is necessary for the Court to enter a new scheduling order. The Court thus **DENIES AS PREMATURE** the parties' Motions *in Limine*. (Docs. 58, 60, 62, 64, 66, 70, 75). The parties may refile such motions in accordance with dates that shall be set in a forthcoming scheduling order.

**SO ORDERED** this 25th day of September, 2012.

        */s/ Harry S. Mattice, Jr.*
        HARRY S. MATTICE, JR.
        UNITED STATES DISTRICT JUDGE